UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>WATSON GRINDING & MANUFACTURING CO.<br><br>Debtor. | § Chapter 11<br>§<br>§ Case No. 20-30967 (MI)<br>§<br>§<br>§ |
| In re:<br><br>WATSON VALVE SERVICES, INC.<br><br>Debtor. | § Chapter 11<br>§<br>§ Case No. 20-30968 (MI)<br>§<br>§<br>§ |

**STATEMENT IN CONNECTION WITH
JANUARY 24 CLAIMANTS COMMITTEE'S EMERGENCY MOTION
FOR APPOINTMENT OF CHAPTER 11 TRUSTEES**

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

John M. Watson files this statement in connection with The Official Committee of January 24 Claimants' (the "Committee") Emergency Motion for Appointment of Chapter 11 Trustees (the "Motion").

1.      John Watson does not oppose the Motion to Appoint a Chapter 11 Trustee. John Watson, as a member of the board of Watson Grinding & Manufacturing Inc. ("Watson Grinding") and Watson Valve Services Inc. ("Watson Valve" and together with Watson Grinding, the "Watson Companies") approved board resolutions consenting to the appointment of a Chapter 11 Trustee and consenting to the appointment of a Chief Restructuring Officer with expanded powers if the Bankruptcy Court determines this to be an appropriate alternative. John Watson files this statement to address false allegations and mischaracterizations made by the Committee in its Motion.

2. John Watson has been the President and Chief Executive Officer of the Watson Companies for forty years. Prior to the explosion that occurred on January 24, 2020, the Watson Companies were very successful and profitable companies employing over 130 people. In some cases, there were multiple generations in the same family employed. As the Chief Executive Officer, John Watson grew the Watson Companies to become two of the most respected companies in their fields with customers spanning the globe.

3. John Watson and the Watson Companies have been active members of the Spring Branch community for years, supporting numerous charitable causes including Carverdale Church Fundraisers, Mission of Yahweh, various baseball, soccer and softball sponsorships, Toys for Tots, Spring Woods High School Theatre, MS150 Cycling Team Sponsorship, and HPD Austin Run.

4. Following the explosion that occurred on January 24, 2020, John Watson has continued in his role as the Chief Executive Officer and addressed numerous operational, financial, and legal problems facing the Watson Companies arising from the explosion. Bob White, John Watson's brother-in-law and the Watson Companies' Chief Operating Officer, and Jason White, John Watson's nephew and Vice President of the Watson Companies, also continued in their roles following the explosion.

5. John Watson, Bob White and Jason White had no prior experience with business bankruptcy cases. The Watson Company's management team retained two sets of bankruptcy attorneys, a financial advisor and an investment banker to advise the Watson Companies in these bankruptcy cases.

6. The financial advisors retained by Watson Valve advised the management team that there was no possibility to rehabilitate Watson Valve and that Watson Valve should be immediately sold. John Watson, Bob White and Jason White, working with Watson Valve's investment banker, had conversations Mogas Industries, Inc. ("Mogas") regarding the sale of substantially all of Watson

Valve's assets. Mogas demonstrated a clear financial wherewithal to close a transaction and a proven track record in the valve industry.

7. After several weeks of negotiations, Mogas made an offer to purchase Watson Valve for $3.2 million. This offer was contingent upon John Watson, Bob White and Jason White all giving Mogas non-compete agreements. Bob White and Jason White notified Mogas that they would not provide non-compete agreements. As a result, Mogas revised its offer from $3.2 million to $2 million, showing the value of the non-compete agreements with Bob White and Jason White to be worth $1.2 million.

8. At about this time, John Watson retained undersigned counsel to advise him in connection with, among other things, his non-compete agreement and his own potential bid for the Watson Valve assets. Undersigned counsel advised John Watson that he was not required to give his non-compete agreement for free, he could commence a new business that would compete with Watson Valve, and he could make a bid for the Watson Valve assets if he so desired.

9. In connection with evaluating his options, John Watson elected to offer Mogas that opportunity to purchase his non-compete agreement for $1 million. This non-compete agreement would prohibit John Watson from working in field of business in which he had made substantially more than $1 million in prior years. After notifying Mogas, Mogas submitted a revised bid that allocated $1 million for John Watson's non-compete agreement. With Watson Valve's financial advisors and bankruptcy attorney pressing for an immediate sale of Watson Valve, having no other bids for the Watson Valve assets, and with the approval of Watson Valve's investment banker, John Watson on behalf of Watson Valve, accepted the Mogas offer subject to the Bankruptcy Court's approval.

10. Within 24 hours after accepting the Mogas offer, Bob White and Jason White, through a newly formed company called JB Valve, LLC submitted a bid to Watson Valve. Jason White and

Bob White, having access to insider information and knowing that Watson Valve's financial advisors were insisting on an immediate sale, demanded that Watson Valve accept their proposal with one business days' notice. This proposal included a $100,000 break-up fee.

11. Mogas, having worked with Bob White and Jason White for several weeks and spending substantial resources in connection with preparing its bid, informed the company that it would not proceed with its potential bid if it had to compete with active insider employees. In order to level the playing field between the bidders and because the Watson Companies no longer needed the Whites' services, John Watson determined in an exercise of his business judgment to terminate the employment of Bob White and Jason White.

12. At the time the Whites submitted their bid, Mogas had never conducted any on-site due diligence and did not have the same information available as the Whites. John Watson, working with Watson Valve's investment banker, gave access to Mogas to conduct on-site due diligence. After completing its on-site diligence on an extremely expedited basis, Mogas submitted a revised bid that was superior to the Whites' bid. The revised bid does not include $1 million allocation for John Watson's non-compete agreement. The revised bid provides, as a condition to closing, that Mogas can require a non-compete agreement from John Watson. Mogas has indicated that it would offer a multi-year non-compete for $300,000, but no agreement has been presented to John Watson. The revised Mogas bid includes other conditions to closing including entering into agreements with other Watson Valve employees.

13. Taking a page from the Whites' play book, Mogas demanded as part of their revised bid a $100,000 breakup fee and $75,000 expenses reimbursement. Despite intense negotiations with Mogas to remove the breakup fee and expense reimbursement from the Mogas proposal, Mogas insisted that it would walk from their bid if not submitted with the breakup fee and expense reimbursement. This revised proposal, having been determined by Watson Valve's investment banker

to be the superior bid, was submitted for the Bankruptcy Court's consideration as a proposed initial bid in a competitive bidding process.

14. As a result of John Watson's work in connection with the sale process, there are now two bidders and the possibility of a competitive bidding process. If Mogas had backed out of the sale process, surely John Watson would have been criticized for having set up a sale of the Watson Valve assets to a company owned by his brother-in-law and his nephew. Having two bidders in the sale process is undoubtedly better than having only one bidder. The Committee's Motion is a gross mischaracterization of the facts and fails to acknowledge the benefit that was created for the Watson Valve estate by having Mogas remain in the bidding process.

15. In addition to mischaracterizing the sale process for the Watson Valve assets, the Committee falsely claimed that John Watson modified the "loss payee" designation on the Watson Companies' insurance policies for the benefit of KMHJ, Ltd. As of the date hereof, the Committee has conducted four depositions on this issue, and the Committee knows this is a false allegation as John Watson did not have any role in changing the loss payee designation.

16. The Committee also takes issue with John Watson's position that Watson Valve is not liable for the January 24, 2020 explosion. Watson Valve is not liable for the January 24, 2020 explosion. This is self-evident from the fact that the explosion did not occur on the Watson Valve property. Watson Valve suffered devastating impacts to its business as a result of the explosion. This Court has identified a conflict between the Watson Companies presumably based on this very issue – the potential claim that Watson Valve has against Watson Grinding related to the explosion. John Watson, through undersigned counsel, asked the Committee to remove a statement in its motion that suggested Watson Valve is liable for the explosion and to confirm Watson's Valve right to object to explosion-related claims being asserted against Watson Valve.

17. The Committee has injected itself into the Watson Valve case even though it is not appointed in the case. The Committee does not want to distinguish between the Watson Companies because it wants to pursue the assets of both companies. Contrary to the Committee's position, John Watson and the professionals of the Watson Valve estate are fulfilling their duties to the Watson Valve estate by preserving Watson Valve's rights to object to claims and preserving Watson Valve's rights to seek a recovery related to the January 24, 2020 explosion.

18. John Watson is currently working on a number of day-to-day operational matters for the Watson Companies including coordinating and directing the cleaning and repair of equipment affected by the explosion, working with contractors and the insurance companies to get bids for cleanup, removal of debris and demolition, identifying and tagging what is Watson Companies' property versus third party property, working with the employees to continue to fulfill customer orders, reviewing and approving accounts payables, reviewing financial reporting for the court, working with the accountants on the Watson Companies' 2019 taxes and the property rendition report for submission to Internal Revenue Service and coordinating security for Watson Companies' site. John Watson believes that with the appointment of a Chapter 11 Trustee, there should be a smooth transition to ensure all these matters are being properly addressed to preserve value for the Watson Companies.

Dated: May 31, 2020

DIAMOND McCARTHY LLP

*/s/ Charles M. Rubio*
Charles M. Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
Two Houston Center
909 Fannin, 37th Floor
Houston, Texas 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199

*Counsel for John M. Watson*

6